Good morning, your honors. Damian Schiff for the appellant at Corbanks North Star Bureau. With the Court's permission, I'd like to reserve just two minutes of my time before we begin. All right. Thank you. The jurisdictional determination issued to the Bureau is judicially reviewable. It constitutes both final and right evidence of action. Judicial review of the J.D. is also reconcilable with the circuit court precedents of other circuits and is, in fact, consistent with the general presumption in favor of judicial review of agency action. The J.D. constitutes final agency action because it is both the consummation of the Corps' analysis of jurisdiction under the Clean Water Act and also because legal and serious practical consequences ensue from the issuance of the J.D. With respect to the consummation issue, there is nothing more that the Bureau can do or that the Corps will do under the applicable administrative appeal regulations with respect to the J.D. issued in this case. The J.D. was sought by the Bureau. It received a positive J.D. from the district Corps engineer that was appealed through all levels of appeal allowed by the Corps. The Corps issued its final appellate decision on the J.D. The Corps' regulations refer to that J.D. as a final agency action, and perhaps most tellingly, the J.D. is expressly stated as being valid for five years. But there's no independent legal consequence that flows from that determination, is there? Name me one legal consequence. Your Honor, I can give you at least two legal consequences and some are very serious practical consequences. The legal consequences, perhaps most significantly, is that a negative J.D. we would submit would be a good estoppel defense for the Bureau. By that I mean were the J.D. to be negative and the Bureau were to proceed with its intended development project of playgrounds and other recreational facilities on its property, that then if the Corps were at a later date to bring an enforcement action against the Bureau, the Bureau could point to the negative J.D. as a reason as to why it is not liable for civil or criminal penalties under the Act. That's not the case here. That's like saying, you know, a defendant who's acquitted could appeal because if he were convicted, he could appeal. Well, Your Honor, the point is that had it been a negative J.D. which the Bureau contends that it is entitled to under the Clean Water Act, that would have been a good estoppel defense. It's like saying... But still listen. Tell me a legal consequence that flows from this determination, does it? Well, Your Honor, it's the opportunity for the estoppel defense. You see, the Bureau essentially is asking... They wanted declaratory judgment from the Corps and they lost. So now they are... They didn't get what they wanted, so therefore... Why is that an affirmative legal consequence? It is analogous, Your Honor, to the instance of a permit denial. For example, a permit is denied. Wait a minute. A permit denial might deny... I'd like to hear what your second legal consequence is, but I'm troubled with the notion that if you had been able to prevail, it would have had a benefit to you. That I could understand. It would have some legal consequence there. Okay? I'm not sure why you would then be appealing and why the courts would get involved, but that's what we're concerned about. The second aspect, the second phase, which is now what you are into, which is absent a negative determination, if you decide to proceed with your playground proposal, then there will be some kind of adjudicatory process or process related to the specifics of what your permit contemplates, and it's quite possible, I suppose, that the court would say, yes, you're subject to our jurisdiction and you're permitted to do what you plan to do. So why do the federal courts intercede until that's happened? But you can answer that question, but I don't want you to forget coming back to your second legal consequence. Yes, certainly, Your Honor. I think it's easiest to understand the argument with reference to permit denial. All sides agree that a permit denial is judicially reviewable. Now, a permit is denied. What does that mean? A landowner can either proceed with his anticipated project and run the risk that he may be filling jurisdictional wetlands or not, and he may apply for another permit. But what he has been denied is the opportunity to fill wetlands with the immunity that a permit provides. Analogously here, by seeking a jurisdictional determination, and had it been a negative jurisdictional determination, the borough would have been provided with the estoppel defense against the subsequent enforcement action. Because it is a positive JV, the borough is in essentially the same position as a negative permit denial would have been. Why? Why? That's what I'm not understanding. You could still prevail at the permit stage, could you not? Your Honor, it is true that the issue of jurisdiction can be raised in a permit proceeding. It can also be raised at the end. That's not my question. I'm just trying to understand. You're drawing this analogy between not getting a negative JD, and it's the equivalent of getting a permit denial. And a permit denial would say you could attack, theoretically, you could attack jurisdiction at that point. And you could also argue under the APA that it was arbitrary and capricious to deny the permit. But at least then the court would be dealing with something tangible that you had tried to accomplish and were denied. But if the court decides, yes, you're subject to our jurisdiction, and if you'll make these modifications to your proposal, we'll let you go ahead and construct in compliance with our duty to enforce the Clean Water Act. So it would never have to come to court then, right? So I don't understand why the JD affirmative step is the functional equivalent of a permit denial. Because unless a JD says, as a practical matter, maybe that's what you're saying, a practical matter, you are either because it's too expensive to pursue or they never grant permits in wetlands. It's the functional equivalent of a permit denial. What are you saying? Well, Your Honor, certainly if the regulated public were to agree with everything the court does, then of course there would never be any need for judicial review. But it is because the Bureau very strongly disagrees with the assertion of jurisdiction that it now seeks judicial review. And that disagreement would maintain and would in fact be the same whether it's now or further at the permit stage or further at the enforcement stage. But with respect to – What was the second legal consequence? Because I've thrown you off track. The second legal consequence is the fact that positive JD goes very much towards the good faith element that a district court is authorized to consider when in an enforcement action it is asked to impose a civil penalty. The existence of the court's study determination that there is jurisdiction here and the landowner's action notwithstanding that fact would give a court a strong basis to justify an otherwise – a civil penalty that otherwise would not be as high as it is. With respect to the practical consequences, Your Honor, that you refer to – I'm not sure I understand that part. So what you're saying with the positive JD, then your client is in a position of deciding either to go for the permit process or not to go ahead and do the building, but then they would be deprived or disadvantaged should the court seek to enforce because they could say, you were clearly on notice, we thought we had jurisdiction, and you should have come into the permit process. That is correct. Okay, thank you. And again, with reference to the issue of practical consequences, I think it is fair to say as a reality of the regulated public's life that a prudent landowner, a reasonable landowner who receives a positive JD knows that that is essentially the indication that he must submit himself to the Clean Water Act permitting process, a process which, notwithstanding the court's somewhat rosy description of it, is long and arduous and, perhaps most importantly, is not a process that guarantees that at the end of the day, the landowner will get what he wants. That is, that you can apply for a permit and be granted a permit, but that permit may allow you to do substantially less than what you had originally anticipated on doing. And further, that even if jurisdiction should eventually be approved not to be present in a challenge to a permit denial or permit grant with conditions, there is no way for the landowner to recoup any of the time or expenses that he has set forth to get to that point. Another reason why judicial review of the JD at this period is critical. That's another reason why the JD, or those negative consequences, sustain the fact that it is a right action. If I may just go back, Your Honors, to the question. Yeah, you can. But let me ask you a question. Clearly, I think it's clear that the Court doesn't think that these JDs are final action for judicial review purposes. If we were to hold that they were, why would they give them out anymore? Your Honor, it may very well be in the calculus of the Court that if it can only offer JDs, if on the condition that they be subject to judicial review, then the agency may very well make that determination that it's not worth it. But in order to do that, you would presumably have to go through the notice and commenting procedures to remove the existing administrative regulations. And in the APA Flesch-Schiena process of notice and comment, I think strong arguments have been made that notwithstanding the cost of judicial review, it is a good idea, most probably because the earlier one knows, both for the agency and for the regulated public, whether or not jurisdiction is present, a great deal of time and effort can be saved. Because if there is never jurisdiction present, and yet it requires a protracted administrative and judicial process through the permit process or eventually through an enforcement action to establish that fact, then a great deal of effort has been wasted, which the Court could have channeled to other areas where jurisdiction is certainly present. So we view your office as an opportunity for a win-win situation, both for the regulated public, but also too for the agency, so that it can focus its limited manpower and budget to the areas that are most needed. Counsel, I'm not sure I heard you correctly. You said a positive J.D. doesn't guarantee a permit. Therefore, all the costs that are involved in going to get the permit, whether it's positive or negative, it seems to be irrelevant. The only argument that I understand you're making is it might affect the penalties that might be imposed upon you. Am I misreading what you're saying? There are, Your Honor, two points. One is the question of whether requiring the landowner to proceed and pass a J.D. to the permit process imposes a harm. And there is a harm, because let us assume that there is no jurisdiction present, but yet the positive J.D. is issued. In order to question jurisdiction, the Court says you must go through the permitting process and then challenge the permit in district court. Well, let's say that the permit is challenged in district court on the grounds that there is no jurisdiction, and the landowner wins, in a sense. The monies and time expended by the landowner, though, in order to get to the permit process, even though the landowner thought that there was never a jurisdiction to begin with, cannot be recovered by the landowner. That is a cost that he must put forth because the J.D., as the Court intends, is not judicially reviewable. But with respect to the finality issue and the legal consequences, in addition to the penalties that could be augmented on the basis of acting notwithstanding a positive J.D., I must go back to the point that the negative J.D. does provide the estoppel defense, and it is analogous, I would submit, to the permitting context because a permit grant provides immunity. A negative permit, a denial of a permit, provides no immunity. The negative denial or the denial of a permit is judicially reviewable. In the same context with the J.D., a positive J.D. means you're on notice. A negative J.D. means you've got a good estoppel defense, and therefore there is an opportunity. You keep mentioning this estoppel defense. What is it? Is that by case law, by regulation, by statute? How does it come about? It is simply case law, general case law, Your Honor, regarding when an estoppel defense is put against an official. All right. Now, my second question is, I'm assuming you're correct, what would you have to invoke it? If the agency says, well, we don't have jurisdiction, what are they going to do? Sue you for not complying? And then if they change their mind, they can change their mind because, you know, it says it's subject to their change. So I don't understand what you're talking about. Well, Your Honor, with respect to that last point, the J.D. says that it's not subject to change if circumstances remain the same. If the environmental circumstances on the property remain the same, then the J.D. is good to five years. The point is that the borough contends that the record and the 1987 weapons manual and the Clean Water Act all say that jurisdiction is not present. Therefore, the borough contends that it is, as a matter of law, entitled to a negative J.D. The agency did not give the borough a negative J.D., and it is that decision that the borough seeks judicial review of now. Because with that negative J.D., it does have the estoppel defense piece of it. I apologize, Your Honor, I've run way over my time. That's all right. We'll give you a minute or so for rebuttal. Thank you. May it please the Court, my name is Robert Oakley. I'm here on behalf of the U.S. Army Corps of Engineers. Let me start by saying why we believe the District Court correctly held that this was not final agency, was not right, and this sort of decision is not refutable under the Clean Water Act. First, there are simply no legal consequences as a result of the determination that these lands are subject to Section 404 permitting requirements. We're not saying to the borough, no, you can't build. We're not saying to the borough, you can only build if you spend billions of dollars on reclamation or mitigation projects. We don't know what would happen in the permitting process. As we point out in our briefs, the Supreme Court has held in the FTC v. Standard Oil case, and this Court has held in Aluminum Company v. United States, that simply requiring an agency, requiring someone who wants something from the agency to go through a permitting process, that does not make something final agency action. That is simply a cost of doing business. And as far as what the cost would be here, if you look at supplemental excerpts of records, pages 18 and 19, we have a declaration in there from a Corps employee. He says that around 98 percent of these permits are granted, and they're granted within 75 days. So we're not talking about a process that goes on for decades or that costs an inordinate amount of money. And I think those figures are much more relevant in this case, given that we're in Alaska and we're talking about an Alaska land, than the figures cited more generally from the Rapanos case, which appear in the borough's brief. As to the statement that counsel made in his opening, that other courts have consistently held that this sort of action is reviewable. In fact, as we pointed out, this circuit admittedly in a non-presidential decision in the Greater Gulfport case rejected exactly the arguments made by here, and that every district court that has looked at it has rejected the arguments made here. Yes. That case is different because that case had the effect, that action by EPA had the effect of undoing a permit. And I think a permit is a very different thing than a jurisdictional determination. A permit is a statement that someone can or cannot do something. Either a permit, if they get a permit, they can do it, or if they don't get a permit, the agency is on record saying they can't. And by analogy, certainly we would never argue that a final action on a permit here is not final agency action. But here, the consequence is we haven't reached that state. We don't know what would happen if the borough went forward. The borough's never gone. The borough may find that it gets a permit that tells it it can do pretty much what it wants with either very little or even possibly no mitigation. So that case was a permit case and this case is not. This case is not. All right. In fact, that's the whole thrust of this case. The borough does not want to go through the permitting process. If the borough goes ahead and they disagree with your jurisdictional determination and starts conducting some construction activity on the site without getting a permit, what does the court issue? Like a cease and desist report or something like that? Or a letter or something? Something like that, right? Or we're going to have to do something, right? That would be a possibility, yes. Now, is that subject to judicial review? The cease and desist order is not subject to judicial review. In fact, the borough concedes cease and desist orders are not subject to judicial review. So if the borough were to follow your action or were to send a letter saying to the borough, stop it or if you don't stop it, we're going to bring an enforcement action, that letter would not let them come into court and say, no, wait, there's no jurisdiction. They'd have to wait for the court to bring it over. So the court's position is the only thing subject to review, the only final actions are one, either some kind of action that imposes a penalty or two, a denial of a permit, something like that? That is correct. If we bring an enforcement action, that certainly would tee up to jurisdictional issues and a defense. And if we deny a permit, then there's no place else for the borough to go. Now, it is a fairly strong, at least an equitable argument that, well, when you do bring a cease and desist proceeding, you know, one of the factors is, well, did you act in good faith? And, of course, the court is going to say, look, we told them that we had jurisdiction, they blatantly refused, so they ought to get, like, you know, cripple the usual penalty, something like that. That's a strong argument, isn't it? It's a hypothetical argument, but if the court, at the risk of enforcement or the dangers of an enforcement action, I think have some merit to them. But the key here is that there is an alternative open, and that alternative is to go for a permit. If you look at Bennett v. Speer, that alternative was not open, either. And so Bennett v. Speer is kind of hard to lay on the template of this case because it involved a biological opinion issued to an agency, and then it was going to affect the way that agency doled out water to third parties. But the point being that you could not get the equivalent, and in that case would have been an incidental take permit to protect you from the E.S. Endangered Species Act. You couldn't get that. Here, there is a very good way for the borough to protect itself from any of these enforcement actions. It applies for a permit, and it preserves its jurisdictional argument, and who knows? Because we don't know what will come out of that permitting process. It may be that the borough can develop the land with fairly few restrictions or possibly even no restrictions. I don't know. None of us, we can tell. At that point, there's nothing for this court to resolve. But right now, what we've got is what the borough wants to do is run up into this court now and challenge jurisdiction. No, what they wanted to do is say, why should we have to go through all of this process when you don't have jurisdiction over us in the first place? There's no new facts that are going to come in on that. The record's there. So if you don't, if you're, let's suppose that you're asserting navigable water proximity that is blatantly unreasonable, why should they have to go through a permitting process to say that that component of the jurisdiction determination is just way off the charts? And therefore, why do we have to wait for some kind of enforcement action? I would add, like, three responses. First, you can't really get into the facts because the way the case was discussed, I don't know if the motion was dismissed, but I don't think it's. No, no, I'm just saying that's a hypothetical. Then secondly, I would say, again, under the FTC case and the aluminum company case, that the necessity of going through a permitting process doesn't allow parties who think that they're not subject to that permitting process to jump ahead and say, well, look, the agency's told us we can get through a permitting process. That's just unfairness. That's just, frankly, the cost of doing business. The third thing, though, is to go to the example you used where you said, well, what if it's just blatantly outside? It's not water. It's the United States. It's interesting. This decision, this jurisdictional determination, was made pre-Ropano's. And the core issue of policy, like I said, was we'll reconsider decisions. Did you want us to look at them again in light of the Ropano's decision? Not an easy decision to follow. The borough's never asked us to do that. It's never said it before. We think Ropano's pulls us way out. We don't care what you said before about the vegetation and how present it was. We think under Ropano's, we didn't ask us to do that. And I think here, though, you've got to think, they're presenting it as a win-win for them, which is, well, you can say to them, or you can say to us, you're dead wrong, and the borough's not free. But if you say, if you allow these sorts of appeals, that means you're going to be, you potentially could be getting this case and other cases like it twice. First, the borough comes up on a jurisdictional determination. You say to them, no, on this record, we think the court's right. Then we go back through the permitting process, and they still don't like it. They say the conditions are too perfect. We come back up to the Ninth Circuit, and you say, no, we're not ready to look at the conditions. You don't have these sorts of piecemeal appeals with district court. There are all sorts of rules of finality to prevent that sort of thing happening. And that's what the court is trying to do here. You get the case all at once where you can see, does it really matter? Was this process, did it produce a permit that was so burdensome that they can't develop the land? Ninety-eight percent of the time, they get the case. You can get the case all at once, or you can go run the risk of piecemealing, which in the end, assuming that the Pacific Legal Foundation doesn't do all of these cases pro bono, could end up costing any people at the borough more money than just going through it once. Well, it's not just a ninety-eight percent, but in that ninety-eight percent of granted permits are, we all know, some permits that are very, very expensive to comply with, exceedingly costly. They could be, but then that would be the case of the borough. The borough would say, well, wait a second. They still think we have that good jurisdictional defense, and it's preserved. We're not saying that they don't get to argue. They do get to argue. It's a question of, do they get to argue with piecemealing? That's what they want to do. And let me get to a point that was raised also during Tom's argument. As we say again, if you look at pages, I think it's either 18 or 19 of the supplemental evidence of record, this decision as to whether they can just make the case is something that the Corps doesn't affirmatively want to do. We work for entities like the borough. They come to us. They want the five-year blessing. That's applied on a district-by-district basis. So the District of Alaska has total discretion. This is not a creature of statute. This creature of regulation is even delegated down to the individual districts as to whether they do this. The District of Alaska could just say, you know what, this is too much trouble, and pull the plug. And if they pull the plug, then entities like the borough, they could get what the borough wanted, a negative determination of jurisdiction. They're out of luck. They've got to start the permitting process and just hope that somewhere during the permitting process they can find a way to short-circuit it by convincing the Corps that there's no jurisdiction here. But again, this could be an example of someone cutting off their nose to swipe their paper. Finally, let me just briefly address it on page, I think, 36, note 11. We list a host of cases, Seventh Circuit and many other circuits, which hold that pre-enforcement of Clean Water Act cases are simply not allowed. We have concession into the brief by the borough that cease and desist orders are not reviewable. Again, here we just waited for, or we set up a process where they came to us and asked for jurisdiction for determination, and now they want to come up to the court over it. I think the model of our case is that compliance with administrative process is simply not something that allows you, and that's too harmful, and we've got to go to court now to do that. And we think that this is a good system that the Corps has developed, where if it's clearly outside the scope of the waters of the United States, they'll tell the party holding the land, and that's the end of the process. But otherwise, they go through the permitting process just like everybody else, like they did before these jurisdictional determinations existed, and then we see what kind of permit they got and whether they still have a complaint about it. If the court has no further questions, thank you very much. Just very quickly, Your Honors, with respect to the basis of the JD and Rapanos issue, Rapanos was not mentioned because the JD has absolutely nothing to do with Rapanos. The JD is all about what is the standard for weapons hydrology in the District of Alaska. Rapanos did not discuss that at all, and their process is entirely inapposite to that issue. With respect to the idea of peaceful litigation, well, that's already present in the current regime. By the concession that a permit grant with conditions or a permit denial can be challenged. Well, if the landowner receives a negative attribution from the district court on the permit, he can still proceed with his development project and then be hauled into court through an enforcement action and then relitigate the jurisdictional issue with an augmented record. There is already the piecemeal danger present, and it hasn't stopped the court from ably enforcing the Clean Water Act. Finally, with respect to the idea of consequences and the idea of the injury to the borough, because it cannot take initial review now, I think the court should be more apt to credit the borough's experience as a regulated party as to the arduousness of the Clean Water Act permitting regime rather than the court. Obviously, the court has it in its interest to paint as sanguine a picture of the process as possible, but the reality of regulated life is that it is not always such, and that even if it is a process that can be done expeditiously, it is still a process that may be done totally unnecessary if jurisdiction is not present, a process that becomes essentially a farce for both parties, a process that deprives the agency itself of the ability to address those environmental harms that really do need assessment by the court. Thank you. Thank you. This court for this session stands adjourned.
judges: Nelson, Tashima, Fisher